UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

———————————————————————————— )
)
CONSERVATION LAW FOUNDATION, INC.,   )
)                Case No. 22-cv-01087 (CVR)
Plaintiff                             )
)
v.                                    )
)
)
SCHNITZER PUERTO RICO, INC.,          )
)
Defendant.                            )
———————————————————————————— )

## <u>CONSENT DECREE</u>

WHEREAS, Plaintiff Conservation Law Foundation ("CLF" or "Plaintiff") filed this action on February 22, 2022 against Schnitzer Puerto Rico, Inc. ("SPR" or "Defendant") alleging violations of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "Act"), and seeking declaratory and injunctive relief, civil penalties, and attorney fees and costs;

WHEREAS, CLF is a non-profit environmental organization incorporated in Massachusetts;

WHEREAS, SPR operates five scrap metal facilities in Puerto Rico, namely: the "Bayamón Facility," located at Road #2 KM 7.7, Corujo Industrial Park in Bayamón, Puerto Rico 00960; the "Caguas Facility," located at Road PR-1 KM 30.0 INT., Barrio Bairoa in Caguas, Puerto Rico 00727; the "Canóvanas Facility," located at Lot 61A, Road PR-188, Canóvanas Industrial Park, San Isidro Ward in Canóvanas, Puerto Rico 00729; the "Ponce Facility," located at Port of Ponce Processed Material Staging Area, Road PR-123 Final, Playa Ward in Ponce, Puerto Rico 00731; and the "Salinas Facility," located at PR-3 KM 156.4, Barrio Aguirre, P. O. Box 1153, in Salinas, Puerto Rico 00751 (collectively, the "Facilities");

WHEREAS, CLF alleges in its complaint dated February 22, 2022 (the "Complaint") and in its amended complaint dated April 13, 2022 (the "First Amended Complaint") that SPR violated the 2015 and 2021 Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (the "2015 MSGP" and the "2021 MSGP," collectively, the "MSGPs") and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and applicable regulations;

WHEREAS, this Consent Decree is a settlement of disputed facts and law, and is not an admission or adjudication regarding any allegations by CLF in this case, nor evidence of any wrongdoing or misconduct on the part of SPR;

WHEREAS, Plaintiff and Defendant (collectively the "Parties") have negotiated this Consent Decree in good faith and at arm's length, and agree that the settlement of the above-captioned action (the "Action") through this Consent Decree without further litigation is in the public interest, and is a fair, reasonable, and appropriate means of resolving all claims in the Action;

WHEREAS, the Parties anticipate that this Consent Decree will enhance the environment by improving water quality in Puerto Rico;

WHEREAS, the Parties consent to the entry of this Consent Decree without further trial, argument, or appeal;

WHEREAS, pursuant to 33 U.S.C. § 1365(c), this Consent Decree is being forwarded to the United States Department of Justice and to the United States Environmental Protection Agency ("EPA") for the forty-five (45) day review period mandated by the Clean Water Act;

NOW, THEREFORE, before the taking of any testimony, below, and with the consent of the Parties,

IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.       JURISDICTION AND VENUE

1.       This Court has jurisdiction over this action, the subject matter herein, and over the Parties consenting hereto, pursuant to 33 U.S.C. § 1365(a)(1) (Clean Water Act jurisdiction) and 28 U.S.C. § 1331 (federal question). An actual, justiciable controversy exists between the Parties. The requested relief is authorized under 28 U.S.C. §§ 2201-2202 and 33 U.S.C. § 1365(c)(1).

2.       Venue properly lies in this Court and district pursuant to 33 U.S.C. § 1365(c)(1), because the events giving rise to this action occurred at SPR's Facilities in Bayamón, Puerto Rico; Caguas, Puerto Rico; Canóvanas, Puerto Rico; Ponce, Puerto Rico; and Salinas, Puerto Rico, which are all located within this judicial district.

3.       Plaintiff gave SPR notice by letter (the "December Notice Letter") of the violations alleged in the Complaint more than 60 days prior to the commencement of this lawsuit. Copies of the December Notice Letter were also mailed to the Administrator of the EPA, the Acting Regional Administrator of EPA Region 1, the Department of Justice Citizen Suit Coordinator, and the Puerto Rico Department of Natural and Environmental Resources ("DNER"). Neither EPA nor Puerto Rico DNER commenced any action prior to Plaintiff's filing of the Complaint.

4.       Plaintiff gave SPR notice by letter (the "February Notice Letter") of the violations alleged in the First Amended Complaint more than 60 days prior to the date of filing. Copies of the February Notice Letter were also mailed to the Administrator of the EPA, the Regional Administrator of EPA Region 2, the Department of Justice Citizen Suit Coordinator, and Puerto Rico DNER. Neither EPA nor Puerto Rico DNER commenced any action prior to Plaintiff's filing of the First Amended Complaint.

5.      SPR consents to this Court's jurisdiction and to venue in this judicial district. SPR consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

6.      This Court shall retain jurisdiction over this case until the Termination Date for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections X (Dispute Resolution) and XIII (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## II.  RELEASE

7.      This Consent Decree is a full and complete settlement and release of all the claims in the Complaint, the First Amended Complaint, the December Notice Letter, and the February Notice Letter, and all other claims known or unknown existing as of the date of entry of the Consent Decree and arising from operation of the Facilities that could be asserted under the Clean Water Act, 33 U.S.C. §§ 1251-1387. Upon termination of this Consent Decree, these claims are released and dismissed with prejudice. Enforcement of this Consent Decree is Plaintiff's exclusive remedy for any violation of its terms.

8.      With the exception of actions to enforce this Consent Decree, during the term of the Consent Decree, CLF will not support, financially or otherwise, any person to sue SPR for any and all claims alleged against SPR in the Amended Complaint and all other claims, known and unknown, existing as of the Effective Date that could be asserted under the Clean Water Act, arising from operation of the Facilities.

## III.   APPLICABILITY

9.      Upon the Effective Date, the obligations of this Consent Decree shall apply to, and be binding upon, the Parties and their respective successors and assigns.

10.     The duties and obligations under this Consent Decree shall not be modified, diminished, terminated, or otherwise altered by the transfer of any legal or equitable interest in the Facilities or any part thereof.  However, if a Facility ceases industrial operations and submits a notice of termination ("NOT"), the requirements of Sections V (Compliance Measures), VI (Compliance Monitoring and Reporting) and VIII (Stipulated Payments) *infra* shall no longer apply to that Facility.

11.     If, during the pendency of this Consent Decree, SPR ceases to operate any of the Facilities, and if there is a successor to the operations, SPR shall serve a copy of this Consent Decree upon the successor operator at least 30 days prior to the contemplated transfer of operations and shall contemporaneously inform the Plaintiff of such transfer. In the event of a transfer of operations, the Parties shall petition the Court to modify the Consent Decree to substitute the successor operator for SPR as a party hereto as agreed to by Plaintiff and the owner of the Facility.

12.     In any action to enforce this Consent Decree, SPR shall not raise as a defense the failure of any of its officers, directors, employees, or agents to take any actions necessary to comply with the provisions of this Consent Decree.

## IV.   DEFINITIONS

13.     Terms used in this Consent Decree that are defined in the Clean Water Act, in regulations promulgated by EPA pursuant to the Act, or in the 2021 MSGP shall have the meanings assigned to them in the Act, such regulations, or in the 2021 MSGP, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.    "30% Design": The design drawing for Infrastructure Improvements prepared to an approximately 30% level and suitable for seeking approval from each facility's landlord. The 30% Design shall include an estimated construction schedule; engineering plans showing a plan view layout of proposed improvements showing grading, paving, and stormwater infrastructure, and profiles of gravity conveyance lines; a basis of design report; and any initial permitting documents to be submitted through the Single Business Portal ("SBP"), the permit application submission website maintained by the government of Puerto Rico at https://sbp.ogpe.pr.gov/, as needed.

b.    "60% Design": The design drawing for Infrastructure Improvements prepared to an approximately 60% level. The 60% Design shall include: engineering plans, stormwater technical reports, and Puerto Rico Environmental Policy Act documentation as needed.

c.    "90% Design": The design drawing for Infrastructure Improvements prepared to an approximately 90% level and suitable for soliciting bids for construction of the improvements and completing permitting actions. The 90% Design shall include an invitation to bid, engineering plans, and specifications.

d.    "100% Design": The complete and final design drawings and specifications for Infrastructure Improvements suitable for procuring equipment and guiding construction activities.

e.    "AIM Triggering Events": Events which trigger the Additional

Implementation Measure ("AIM") requirements as defined in Section 5.2.2 of the 2021 MSGP.

f.      "Annual Report": The yearly report required under Section 7.4 of the 2021 MSGP.

g.      "Best Management Practices": Stormwater control measures, not including infrastructure construction or the installation of new stormwater treatment systems, designed to minimize pollutant discharges. Best Management Practices may, as necessary, include more frequent cleaning, sweeping, inspection and maintenance of drain inlet protection, reducing exposure of sources of stormwater pollution, and routine maintenance and repair of existing stormwater control infrastructure. The Best Management Practices shall include all operations, maintenance, and other practices currently required by each Facility's applicable Stormwater Pollution Prevention Plan, as well as the Best Management Practices detailed in Exhibit A to this Consent Decree.

h.      "Corrective Action Triggering Events": Those events which the 2021 MSGP defines as such in Section 5.1 of the 2021 MSGP.

i.      "Discharge Monitoring Report": The quarterly stormwater monitoring report required under Sections 4.1.9, 7.1, and 7.3 of the 2021 MSGP.

j.      "Effective Date": The date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket.

k.      "Fully operational": Fully installed, calibrated, and operating.

l.      "Implementing Organization": The third-party entity, Comité Diálogo

Ambiental, Inc., implementing the Supplemental Environmental Projects

described in Exhibit B of this Consent Decree.

m.     "Infrastructure Improvements": The construction or implementation of

infrastructure at the Facilities designed so that discharges comply with the

2021 MSGP.

n.      "Monitoring Point": The locations at the Facilities where SPR collects

stormwater samples pursuant to Section 4 of the MSGP, as identified by

the applicable Stormwater Pollution Prevention Plan for each facility.

o.      "Quarterly Inspection Report": The documentation required under Section

3.1.6 of the 2021 MSGP.

p.      "Supplemental Environmental Project": A project consisting of water

quality improvement measures and/or educational programs with the goal

of promoting restoration, preservation, protection, or other beneficial

impacts on water quality in the watersheds near the Facilities. This project

will be implemented by the Implementing Organization pursuant to the

terms provided in Exhibit B.

q.      "Stormwater Pollution Prevention Plan": The plan required under Section

6 the 2021 MSGP.

r.      "Termination Date": The date on which the Consent Decree term ends,

which is five years after the Effective Date pursuant to Section XII

(Effective Date and Termination).

s.      "Water Quality Standards": The standards established pursuant to 33

U.S.C. § 1313 and listed at P.R. Dep't of Natural & Env't Res. Reg. 9079 §§ 1300, *et seq.*

14.    In the Consent Decree, unless the context otherwise requires:

a.    References to Paragraphs, Sections, and Exhibits are references to sections and exhibits of the Consent Decree;

b.    The descriptive headings of the several Sections of the Consent Decree are inserted for convenience only, do not constitute a part of this Decree, and shall not affect in any way the meaning or interpretation of the Consent Decree;

c.    "Include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import; and

d.    References to "Dollars", "dollars" or "$" without more are references to the lawful currency of the United States of America.

15.    All references to a duration of "days" shall be calendar days unless otherwise specified. In computing any period of time under the Consent Decree, where the last day would fall on a Saturday, Sunday, federal holiday, or official holiday recognized in Puerto Rico, the period shall run until the close of business of the next business day.

## V.    COMPLIANCE MEASURES

16.    SPR shall comply with the 2021 MSGP, the Clean Water Act, and applicable Clean Water Act regulations. The 2021 MSGP and subsequent MSGPs, as may be updated from time to time, are incorporated into the Consent Decree by reference.

17.     SPR shall implement and/or maintain Best Management Practices to control stormwater at its Facilities as identified in Appendix A. SPR shall continue to maintain the Best Management Practices as necessary until the Termination Date.

18.     SPR shall install and/or construct Infrastructure Improvements at the Facilities. The Infrastructure Improvements shall be designed for each of the Facilities to meet the requirements of the 2021 MSGP, in accordance with the schedules and processes set forth in Paragraphs 19-23.

19.     SPR shall install and/or construct Infrastructure Improvements at the Bayamón Facility according to the following schedule:

      a.     SPR shall continue the process of seeking approval from the Municipality of Bayamón for the 90% Designs for Phases I and II of the Infrastructure Improvements, as defined by the engineering documents previously submitted to the Municipality of Bayamón and provided to CLF.

      b.     SPR shall submit the 90% Designs for Phases I and II to CLF for review and comment within one month of receiving approval from the Municipality of Bayamón.

      c.     SPR shall submit the 90% Design for Phases I and II to the Municipality of Bayamón, as required, within one month of responding to comments from CLF.

      d.     Phase I of the Infrastructure Improvements shall be Fully Operational within one year of receiving all required permitting approvals. Should SPR find itself unable to complete the construction/installation within the

timeframe set forth herein, SPR shall follow the procedure provided in

Paragraph 46.

e.      Phase II of the Infrastructure Improvements shall be Fully Operational

within one year of completing construction of Phase I. Should SPR find

itself unable to complete the construction/installation within the timeframe

set forth herein, SPR shall follow the procedure provided in Paragraph 46.

f.      SPR shall submit the 30% Design for Phase III to CLF for review and

comment within 4 months of completing construction and/or installation

of Phase I and II of the Infrastructure Improvements for the Bayamón

facility.

g.      SPR shall submit the 30% Design for Phase III to the Municipality of

Bayamón for approval within two weeks of responding to CLF's

comments.

h.      SPR shall follow up with the Municipality of Bayamón to seek approval

for the 30% Design for Phase III within 30 days of its submittal.

i.      SPR shall submit the 60% Design for Phase III to CLF for review and

comment within four months of receiving approval for the 30% Design for

Phase III from the Municipality of Bayamón.

j.      SPR shall submit the 60% Design for Phase III to the Municipality of

Bayamón for permitting approval, if required, within one month of

responding to CLF's comments on the 60% Design.

k.      Phase III of the Infrastructure Improvements shall be Fully Operational

within one year of completing Phase II of the Infrastructure Improvements

and receiving all required permitting approvals. Should SPR find itself unable to complete the construction/installation within the timeframe set forth herein, SPR shall follow the procedure provided in Paragraph 46.

    l.    SPR shall submit a revised Stormwater Pollution Prevention Plan to CLF within 30 days of the Infrastructure Improvements becoming Fully Operational for all construction phases.

20.    SPR shall install and/or construct Infrastructure Improvements at the Caguas Facility according to the following schedule:

    a.    SPR shall submit the 30% Design to CLF for review and comment by March 31, 2023.

    b.    SPR shall submit the 30% Design to the Municipality of Caguas for approval within two weeks of responding to CLF's comments.

    c.    SPR shall follow up with the Municipality of Caguas to seek approval 30 days after submitting the 30% Design.

    d.    SPR shall submit the 60% Design to CLF for review and comment within four months of receiving approval for the 30% Design from the Municipality of Caguas.

    e.    SPR shall submit the 60% Design to the Municipality of Caguas, if required, within two weeks of responding to CLF's comments on the 60% Design.

    f.    The Infrastructure Improvements shall be Fully Operational within one year of receiving all required permitting approvals. Should SPR find itself

unable to complete the construction/installation within the timeframe set forth herein, SPR shall follow the procedure provided in Paragraph 46.

    g.    SPR shall submit a revised Stormwater Pollution Prevention Plan to CLF within 30 days of completing construction and/or installation of the Infrastructure Improvements.

21.    As of the Effective Date, the Infrastructure Improvements at the Canóvanas Facility are Fully Operational. SPR shall submit a revised Stormwater Pollution Prevention Plan for the Canóvanas Facility to CLF by the Effective Date.

22.    SPR shall install and/or construct Infrastructure Improvements at the Ponce Facility according to the following schedule:

    a.    SPR shall submit the 30% Design to CLF for review and comment by March 31, 2023.

    b.    SPR shall submit the 30% Design to the Port of Ponce Authority for approval within two weeks of responding to CLF's comments.

    c.    SPR shall follow up with the Port of Ponce Authority to seek approval 30 days after submitting the 30% Design.

    d.    SPR shall submit the 60% Design to CLF for review and comment within four months of receiving approval for the 30% Design from the Port of Ponce Authority.

    e.    SPR shall submit the 60% Design to the Port of Ponce Authority for permitting approval, if required, within two weeks of responding to CLF's comments on the 60% Design.

... 

f.    The Infrastructure Improvements shall be Fully Operational within one year of receiving all required permitting approvals. Should SPR find itself unable to complete the construction/installation within the timeframe set forth herein, SPR shall follow the procedure provided in Paragraph 46.

g.    SPR shall submit a revised Stormwater Pollution Prevention Plan to CLF within 30 days of completing construction and/or installation of the Infrastructure Improvements.

23.    SPR shall install and/or construct Infrastructure Improvements at the Salinas Facility according to the following schedule:

a.    SPR shall submit the 30% Design to CLF for review and comment by March 31, 2023.

b.    SPR shall submit the 60% Design to CLF for review and comment within four months of responding to CLF's comments on the 30% Design.

c.    SPR shall submit the 60% Design to local authorities for permitting approval, if required, within two weeks of responding to CLF's comments on the 60% Design.

d.    The Infrastructure Improvements shall be Fully Operational within one year of receiving all required permitting approvals. Should SPR find itself unable to complete the construction/installation within the timeframe set forth herein, SPR shall follow the procedure provided in Paragraph 46.

e.    SPR shall submit a revised Stormwater Pollution Prevention Plan to CLF within 30 days of completing construction and/or installation of the Infrastructure Improvements.

24.     CLF shall respond to SPR's submission of 30% Designs and 60% Designs with suggested revisions and areas for improvement, if any. SPR shall consider CLF's concerns and requests for revisions in good faith and respond to CLF's comments within one month of receiving the comments by either resubmitting revised plans and/or preparing a written response to CLF's comments.

25.     The 90% Designs shall be substantially consistent with SPR's final 60% Designs (including any necessary revisions) and/or written response to CLF's comments.

26.     Prior to beginning construction, SPR shall provide CLF with 100% Design Plans for the Infrastructure Improvements at each of the Facilities. The 100% Design Plans and the constructed Infrastructure Improvements shall be substantially consistent with the 90% Designs, subject to potential amendments to be discussed between the Parties if such needs arise during construction.

### VI.     COMPLIANCE MONITORING AND REPORTING

27.     By January 30 of each year until the Termination Date, SPR shall submit a progress report to CLF that describes the status of the Best Management Practices and Infrastructure Improvements, including an explanation of whether such upgrades have been completed or implemented and any delays in construction or implementation.

28.     SPR shall comply with all inspection, monitoring, and reporting requirements set forth in the 2021 MSGP.

29.     Starting from the date that the Infrastructure Improvements for each Facility are Fully Operational, SPR shall conduct monthly benchmark monitoring in accordance with the requirements for quarterly monitoring under the 2021 MSGP. In the absence of a qualifying storm event, SPR must take a substitute sample during the next qualifying storm event (i.e., if

adverse weather makes sampling impossible one month, SPR must take two samples in the following month: the substitute sample and the regularly scheduled sample). In the event there are fewer than three qualifying storm events in a quarter, SPR must sample each qualifying storm event but is excused from the obligation to take any other samples during the quarter. At such time that the results show that the Facility's discharge did not exceed a benchmark for a parameter for nine consecutive months, the Facility will cease monitoring monthly for that parameter and will begin monitoring quarterly for that parameter through the term of the Consent Decree. For example, once the Infrastructure Improvements are constructed or installed at the Ponce Facility and the Facility's monitoring results show that the Facility's discharge for nine consecutive months has not exceeded the benchmark for copper, the Ponce Facility will cease monitoring monthly for copper and will begin monitoring quarterly for copper. For the purpose of calculating consecutive months of compliance, and assuming monitoring was conducted in compliance with this paragraph, a month where no monitoring was conducted for a given parameter shall be treated the same as a month where the Facility's discharge exceeded the benchmark for that parameter (except where such monitoring was excused in the absence of a qualifying storm event).

30.     Monitoring shall be conducted pursuant to the procedures and requirements in the 2021 MSGP. If monitoring is not conducted pursuant to the procedures and requirements in the 2021 MSGP, SPR shall submit documentation to CLF with the Quarterly Inspection Report explaining how and why monitoring deviated from the procedures and requirements of the 2021 MSGP.

31.     During the term of the Consent Decree, SPR shall send to CLF benchmark monitoring results, quarterly Discharge Monitoring Reports, and laboratory reports for each

Facility no later than 30 days after the Defendant has received the laboratory results for all Monitoring Points for the reporting period.

32.    During the Consent Decree term, SPR shall send to CLF Quarterly Inspection Reports for each Facility within 30 days of the end of each calendar quarter and the Facilities' Annual Reports by January 30 of each year.

33.    During the Consent Decree term, SPR shall provide copies to CLF of all documents submitted to the EPA, Puerto Rico DNER, or any of the municipalities in which the Facilities are located related to Clean Water Act compliance at the Facilities, Best Management Practices, or the Infrastructure Improvements. Such documents shall be provided to CLF concurrently with the submission to EPA, Puerto Rico DNER, or the municipality.

## VII.    PAYMENTS

A.    Supplemental Environmental Projects

34.    SPR shall pay a total of $825,000 to fund Supplemental Environmental Projects pursuant to the terms provided in Exhibit B on or before 90 days following the Effective Date.

35.    SPR shall not deduct any penalties or payments paid under Section VII (Payments) or Section VIII (Stipulated Payments) in calculating its federal, state, or local income tax.

36.    CLF will request from the Implementing Organization annual status reports which are due each year on the anniversary of the payment deadline in Paragraph 34 while funds are being spent. CLF will arrange to have the annual status reports provided to SPR, pursuant to the notice provision in Section XI (Notices). The status reports will include, at a minimum, the following information: (i) description of activities completed to date and related expenditures of

Project Funds; and (ii) a discussion of any anticipated changes to the scope or timeline of the Mitigation Projects.

B.     Costs of Litigation

37.     Consistent with 33 U.S.C. § 1365(d), within 30 days of the Effective Date, SPR shall pay $120,025 by company check or other agreed upon payment method to Plaintiff, as reimbursement for CLF's attorneys' fees and costs incurred or to be incurred in this matter, including any future attorneys' fees and costs relating to the implementation or monitoring of compliance with this Consent Decree.

C.     Late Fees

38.     SPR shall pay $500 per day for any payment made pursuant to Consent Decree Sections VII.A, VII.B, or VIII that is more than 14 calendar days late ("Late Fee").

39.     SPR shall pay any Late Fee within 14 days of any payments made pursuant to Sections VII.A, VII.B, or VIII of this Consent Decree.

40.     Late Fees for the late payment of Plaintiff's attorneys' fees and costs shall be paid to CLF. All other Late Fees shall be paid to the Implementing Organization.

**VIII.   STIPULATED PAYMENTS**

41.     From the Effective Date until the Infrastructure Improvements are Fully Operational, pursuant to Paragraphs 19-23, SPR shall pay Stipulated Payments to the Implementing Organization in the amount of $500 per Facility per quarter for each failure to monitor a Monitoring Point as required by the 2021 MSGP. If SPR fails to monitor at a Monitoring Point, SPR shall owe stipulated payments in the total amount of $500 per Monitoring Point. Stipulated payments shall not be calculated per parameter.

42.     From the date on which the Infrastructure Improvements are Fully Operational, pursuant to Paragraphs 19-23, until the Termination Date, SPR shall pay Stipulated Payments to the Implementing Organization for the following events:

    a.      Benchmark exceedances as follows: $1,000 for the first calendar quarter following the Infrastructure Improvements becoming Fully Operational if the average of that quarter's three monthly samples exceeds a parameter's 2021 MSGP sector-specific benchmark. For each subsequent calendar quarter in which the average of that quarter's three monthly samples exceeds a parameter's 2021 MSGP sector-specific benchmark, SPR shall pay $5,000 per calendar quarter. For the avoidance of doubt, if this provision is triggered, SPR will pay a single stipulated payment per quarter per Facility;

    b.      $5,000 per Facility per quarter in which there occurs any of the following Corrective Action Triggering Events:

        i.      An unauthorized release or discharge pursuant to Section 5.1.1.1 of the 2021 MSGP; or

        ii.     A visual assessment shows odor, foam, or oil sheen in the discharge pursuant to Sections 3.2.2.4 and 5.1.1.5 of the 2021 MSGP;

    c.      $1,000 per Facility per quarter in which there occurs any Corrective Action Triggering Events not listed in Paragraph 42.b; and

    d.      $1,750 per Monitoring Point per month for each failure to conduct monthly monitoring and $5,000 per quarter for each failure to conduct

quarterly monitoring at a Monitoring Point required pursuant to the 2021

MSGP or Paragraph 29 of the Consent Decree. If SPR fails to monitor at a

Monitoring Point, SPR shall owe stipulated payments in the total amount

of $1,750 or $5,000 and shall not owe stipulated payments for each

individual parameter that SPR failed to monitor.

43.     From the Effective Date until the Termination Date, SPR shall pay Stipulated

Payments in the amounts specified below to the Implementing Organization for the following

events:

     a.     $100 per day for each failure to complete and submit to EPA a report

required under the 2021 MSGP;

     b.     $100 per day for each failure to provide CLF with a report or other

documentation required under Section VI (Compliance Monitoring and

Reporting) of the Consent Decree; and

     c.     $1,000 per week beginning one week after the deadline for each failure to

timely complete a required action under Section V (Compliance

Measures) of the Consent Decree.

44.     All stipulated payments pursuant to this consent decree shall be paid to the

Implementing Organization within 30 days of the triggering event.

## IX.     FORCE MAJEURE

45.     "Force Majeure," for purposes of the Consent Decree, is defined as any event

arising from causes beyond the control of SPR, of any entity controlled by SPR, or of SPR's

contractors that delays or prevents the performance of any obligation under the Consent Decree

despite SPR's commercially reasonable efforts to fulfill the obligation. A minor increase in costs

(less than 25%), a change in financial circumstances, or SPR's economic inability to comply are not Force Majeure events. Force Majeure events shall include, but not be limited to, acts of God, including earthquakes, hurricanes, and other unusually adverse natural or weather conditions; war, insurrection, or civil disturbance; strikes; restraint by court order or order of public authority; supply chain constraints which delay the delivery of supplies and/or equipment by one month or more and where comparable supplies and/or equipment are not available; and delays associated with or caused by pandemics. During the period of any Force Majeure event, stipulated payments shall not accrue.

## X.  DISPUTE RESOLUTION

46.     If any event occurs that causes or may cause delay in the performance of any obligation under the Consent Decree, SPR shall notify CLF within 10 working days of the date on which SPR became aware of the potential delay. Upon notification, CLF shall have the right to request all necessary documentation explaining the potential delay. If requested, SPR shall have 10 working days from the date of the request to provide the documentation. CLF shall have the right to grant all or part of any extension requested by the Defendant. If the delay in SPR's performance of any obligation under the Consent Decree is due to a Force Majeure event and the Parties cannot reach agreement, the provisions of Paragraph 49 of this Consent Decree shall govern. SPR shall not be required to pay stipulated payments during the time between the date which CLF receives such a request from SPR and the date which a final decision is issued regarding such request. If CLF denies SPR's request for an extension, SPR shall pay all stipulated payments that were deferred during the pendency of the request, unless SPR invokes the process under Paragraph 49 and prevails.

47.     The Parties agree to work together in good faith to resolve any disputes prior to engaging in the dispute resolution process described in Paragraphs 49 and 50.

48.     The following types of disputes shall be resolved pursuant to the binding dispute resolution process described in Paragraph 49:

  a. Disputes arising from delays due to Force Majeure events as described in Paragraph 46; and

  b. Disputes over whether SPR has triggered an obligation to pay a stipulated payment and in what amount.

49.     If the Parties are unable to resolve any disputes listed in Paragraph 48, the Parties shall mutually select a neutral third party to make a binding determination (the "Arbitrator"). To seek a determination from the Arbitrator, the party seeking a determination shall submit documentation to the Arbitrator and provide a copy to the other party at that time. The other party shall have 14 days to respond by submitting their own documentation. If the Parties remain in disagreement after submission of the documentation, the Arbitrator shall review the submitted documentation and issue a written, binding, non-appealable determination simultaneously to both Parties. The Arbitrator's fees shall be paid by the non-prevailing party.

50.     Jurisdiction shall be retained by the Court to enforce the terms and conditions of the Consent Decree, to modify the Consent Decree, and to resolve all other disputes not listed in Paragraph 48.

## XI.     NOTICES

51.     Unless otherwise provided herein, whenever notifications, submissions, or communications are required by the Consent Decree, they shall be made in writing and addressed as follows:

For Plaintiff:
Clean Air and Water Paralegal
Ethan Hsi
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
ehsi@clf.org

For SPR
General Counsel
Schnitzer Puerto Rico, Inc.
299 SW Clay St. – Suite 350
Portland, OR  97201
generalcounsel@schn.com

and

Beth Ginsberg
Stoel Rives
600 University Street, Suite 3600
Seattle, WA 98101-4109
beth.ginsberg@stoel.com

52. Any Party may, by written notice to the other Party, change its designated notice recipient, address, or means of transmittal provided above.

53. All notifications, communications, or submissions made pursuant to this Section shall be sent by electronic mail. Any Party planning a communication by non-electronic means should first attempt to contact the opposing Party to confirm the appropriate mailing address.

## XII.   EFFECTIVE DATE AND TERMINATION

54. The Effective Date of the Consent Decree shall be the date upon which the Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket (the "Effective Date"). All obligations arising under the Consent Decree shall become effective as of the Effective Date.

55. The Consent Decree shall terminate five years after the Effective Date on the "Termination Date".

## XIII.   MODIFICATION

56. The terms of the Consent Decree may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of the Consent Decree, it shall be effective only upon approval by the Court.

## XIV.   SIGNATORIES/SERVICE

57. Each undersigned representative of the Parties certifies that they are fully authorized to enter into the terms and conditions of the Consent Decree and to execute and legally bind the Party they represent to this document.

## XV.   SEVERABILITY

58. The provisions of this Consent Decree shall be severable, and should any provision hereof be declared invalid or unenforceable, the remainder shall continue in full force and effect between the parties.

## XVI.   INTEGRATION

59. The Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.

## XVII. FINAL JUDGMENT

60. Upon approval and entry of the Consent Decree by the Court, the Consent Decree shall constitute a final judgment of the Court as to the Plaintiff and the Defendant.

## SIGNATURE PAGE

**Conservation Law Foundation, Inc.**

By: _____     Date: ___11/28/2022_____

Heather A. Govern
Conservation Law Foundation
62 Summer Street
Boston, MA 02110


**Schnitzer Puerto Rico, Inc.**

By: *John B Hebert*_____     Date: __*11-23-2022*__

John Hebert
Schnitzer Puerto Rico, Inc.
299 SW Clay Street; Suite 350
Portland, OR 97201



Dated and entered this 31st day of January, 2023.


S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES DISTRICT JUDGE

**EXHIBIT A**

**BEST MANAGEMENT PRACTICES**

I.     **Best Management Practices to Be Implemented by SPR at the Facilities**

    A.  Every two weeks, SPR shall:

        1.  Sweep (manually or with a mechanical sweeper) all paved areas at the Facilities, including around all storm drains and stormwater inlets.

    B.  Every month, SPR shall:

        1.  Inspect and remove any sediment and debris accumulation at the Facilities, including any sediment and debris in and around the stormwater conveyance infrastructure, in and around the surface flow paths at the catch basins, and on the ground surfaces surrounding each of the catch basins; and

        2.  Clean the secondary containment dikes of all diesel fuel storage tanks stored at the Facilities.

    C.  Every quarter, SPR shall:

        1.  Inspect and clean all oil/water separators at the Facilities. SPR shall inspect all inlet pipes and outlets for clogging, and remove any floating debris and trash, accumulated sediments, and/or floating hydrocarbons.

    D.  Annually, SPR shall:

        1.  Inspect and repair if necessary all catch basin inlets at the Facilities for erosion and clogging;

        2.  Remove the sediment in all catch basin filter inserts at the Facilities; and

        3.  Replace X-Tex filter fabric and straw wattles at all stormwater drains at the Facilities.

E.   After large precipitation events (more than 3.5 inches in 24 hours), SPR shall:

   1.   Inspect the straw wattles at the Facilities and perform maintenance as

        needed.

**EXHIBIT B**

**SUPPLEMENTAL ENVIRONMENTAL PROJECT DESCRIPTION**

I.     **MITIGATION PROJECTS**

    A.     **Implementing Organization:** Comité Diálogo Ambiental, Inc. ("Diálogo")

    B.     **Project Funds:** $825,000

    C.     **Mitigation Project 1:** Land Conservation and Native Plant Restoration

        1.     <u>Description of Project</u>: This Mitigation Project will include the following

        components:

           a.     Purchase an ecologically significant parcel of land in the Jobos

                Bay Area near Laguna Punta Arenas, Río Nigua, or Laguna Mar

                Negro which is contiguous to or comprises part of a larger wetland,

                mangrove forest, salt flat, or other habitat relied on by native plant

                and animal species, including endangered hawksbill turtles, West

                Indian manatees, brown pelicans, peregrine falcons, and/or yellow-

                shouldered blackbirds.

           b.     Restore the parcel of land by planting new native plant features or

                maintaining existing native plant features. Restoration may include

                planting natural barriers, such as mangroves, patchouli, and other

                native plants.

           c.     Conduct monthly trainings to promote pollution reduction

                techniques and the planting of native plants as natural barriers in

                the communities near the Río Hondo, the Río Bairoa, the coastal

                watershed between the Río Sabana and the Río Grande de Loiza,

the Caribbean Sea, and/or Jobos Bay. The trainings will teach

community members how to plant natural barriers, such as

mangroves, patchouli, and other native plants, in their own

communities for the purpose of reducing water pollution and

improving water quality.

d.    Conduct general water quality investigations to protect the

watersheds near the Río Bairoa, the coastal watershed between the

Río Sabana and the Río Grande de Loiza, and the Caribbean Sea.

2.    <u>Projected Water Quality and Environmental Benefits</u>: Natural barriers of

mangrove, patchouli, and other native plants protect water quality by

removing nutrients and pollutants from stormwater runoff. The complex

root systems and high toxicity resistance of mangroves allow them to filter

heavy metal pollutants like copper, zinc, cadmium, chromium, and

mercury. Mangroves and other native plants filter nitrates, phosphates, and

ammonia, reducing the nutrient pollution that rivers carry to the sea by

between 60 and 90% for mangroves and around 30% for patchouli and

other native plants. Mangroves also increase dissolved oxygen levels by

about 33%.

Natural barriers of mangroves and other native plants carry

additional environmental and ecological benefits beyond their positive

impact on water quality. Mangrove forests are a unique coastal ecosystem

that provide habitat for a variety of animals, including many threatened

and endangered species like the hawksbill sea turtle and the West Indian

manatee, as well as about 75-90% of commercially caught fish. In areas of severe water pollution, mangrove forests have a strong positive effect on maintaining biological diversity, compared with other habitats. The roots of mangroves and other native plants hold soil in place, thereby stabilizing the coastline, reducing erosion, and providing a natural barrier against flooding and destructive storms. The coastal conditions mangroves create also allow for the capture and storage of large amounts of carbon dioxide emissions, making the forests a useful tool in mitigating the impacts of climate change.

**D.**    **Mitigation Project 2:** Environmental Quality Assessment at Jobos Bay

1.    <u>Description of Project</u>: This Mitigation Project will include the following components:

a.    Conduct water quality sampling and/or monitoring of the sources to Jobos Bay, including the South Coast Aquifer, which is the sole source of potable water for tens of thousands of people. Sampling and monitoring will take place every six months.

b.    Conduct biannual surveys of the conditions of the environment in and around Jobos Bay, including the conditions of plants and animals.

c.    Organize biannual workshops to train community members in water quality sampling and monitoring. Trained community members will participate in the water quality sampling and monitoring of the sources to Jobos Bay.

2.  <u>Projected Water Quality Benefits</u>: Water quality data collected from this project will inform and enhance Diálogo's efforts to reduce potential environmental risks and hazards for the already over-burdened community of Salinas. The South Coast Aquifer and Jobos Bay face environmental issues including overdevelopment, water pollution from landfills, power plant discharges, and coal combustion residual waste. The water quality assessment project will empower Diálogo's advocacy for the community members that obtain drinking water from the South Coast Aquifer and recreate at Jobos Bay.

## II.   GENERAL OBLIGATIONS AND REPORTING

A.  **Annual Reports:** The Implementing Organization will submit to the Parties, pursuant to Section XI (Notices), annual status reports due on January 31st of each year while funds are being spent. The status reports will include, at a minimum, the following information: (i) description of activities completed to date and related expenditures of Project Funds; and (ii) a discussion of any anticipated changes to the scope or timeline of the Mitigation Projects.

B.  **Unspent Funds:** Any Project Funds that remain unspent as of five calendar years after the date of entry of the Consent Decree by the Court will be directed to community environmental projects in Puerto Rico that are similar to or serve similar purposes as the Mitigation Projects. In the event that unspent Project Funds exist, the Implementing Organization will submit to the Parties an accounting of such funds and a description of the intended use for such unspent Project Funds.